


ABS/JN:MGD
F. #2019R01376

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ DEC 23 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------- X

UNITED STATES OF AMERICA

- against -

ANAND KALEPU,

Defendant.

--------------------------- X

INFORMATION

Cr. No. 19-602 (AMD) (PK)
(T. 18, U.S.C., §§ 982(a)(7), 982(b)(1), 1349 and 3551 et seq.; T. 21, U.S.C., § 853(p))

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise indicated:

I. Background

A. The Medicare Program

1. The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who received Medicare benefits were referred to as Medicare "beneficiaries."

2. Medicare was a "Federal health care program" as defined by Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

3. Medicare included coverage under four primary components, hospital insurance ("Medicare Part A"), medical insurance ("Medicare Part B"), Medicare Advantage

("Medicare Part C") and prescription drug benefits ("Medicare Part D"). Medicare Part B covered medically necessary physicians' services and outpatient care, including durable medical equipment, prosthetics, orthotics and supplies ("DMEPOS"), such as Off-The-Shelf ("OTS") ankle braces, knee braces, back braces, elbow braces, wrist braces and hand braces (collectively, "OTS braces"). OTS braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling and customizing to fit to the individual. CMS contracted with various companies to receive, adjudicate, process and pay Medicare Part B claims, including claims for OTS braces.

4. Companies that provided DMEPOS services and physicians and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to abide by the policies and procedures, rules and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees and contractors, were required to abide by all provisions of the Social Security Act (the "Act"), the regulations promulgated under the Act and applicable policies, procedures, rules and regulations issued by CMS and its authorized agents and contractors. Health care providers were provided with online access to Medicare manuals and services bulletins describing proper billing procedures, rules and regulations.

5. If Medicare approved a provider's application, Medicare assigned the provider a Medicare Provider Identification Number ("PIN" or "provider number"). A health care provider who was assigned a Medicare PIN and provided services to beneficiaries was able to submit claims for reimbursement to the Medicare contractor/carrier that included

the PIN assigned to that medical provider. Payments under the Medicare program were often made directly to a provider of the goods or services, rather than to a Medicare beneficiary. This payment occurred when the provider submitted the claim to Medicare for payment, either directly or through a billing company.

6. Under Medicare Part B, claims for DMEPOS were required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury. Medicare used the term "ordering/referring" provider to identify the physician or nurse practitioner who ordered, referred or certified an item or service reported in that claim. Individuals ordering or referring these services were required to have the appropriate training, qualifications and licenses. A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the services were provided, the cost of the services, the name and PIN or other health care provider who had ordered the services and the name and identification number of the DMEPOS provider that had provided the services. Providers conveyed this information to Medicare by submitting claims using billing codes and modifiers.

7. To be reimbursed from Medicare for DMEPOS, the items or services had to be reasonable, medically necessary, documented and actually provided as represented to Medicare. Medicare would not pay claims procured through kickbacks and bribes. To receive reimbursement for a covered service from Medicare, a provider was required to submit a claim, either electronically or using a form containing the required information appropriately identifying the provider, patient and services rendered, among other things.

8. Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical

assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare required complete and accurate patient medical records so that Medicare could verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider.

B. Telemedicine

9. "Telemedicine" provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or the telephone, to interact with a patient.

10. Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients. In order to generate revenue, telemedicine companies typically either billed insurance or offered a membership program to customers.

11. Medicare Part B covered expenses for specified telemedicine services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was at a practitioner's office or a specified medical facility – not at the beneficiary's home – during the telemedicine consultation with a remote practitioner.

C. The Defendant and Related Entity

12. At all times relevant to this Information, the defendant ANAND KALEPU was a medical doctor licensed to practice in Ohio whose practice included telemedicine. KALEPU was a resident of Cleveland, Ohio.

13. Between approximately December 2018 and April 2019, the defendant ANAND KALEPU worked as an independent contractor for a company ("Company-1"), a telemedicine company, the identity of which is known to the United States. Company-1 was a Delaware corporation with its principal office in Boca Raton, Florida.

II. The Fraudulent Scheme

14. Between approximately December 2018 and April 2019, the defendant ANAND KALEPU, together with others, agreed to execute and executed a scheme to defraud Medicare by submitting and causing to be submitted claims to Medicare: (a) for services not rendered; (b) that misrepresented the nature of the services rendered; (c) for services that were not medically necessary; and (d) for services that otherwise did not qualify for payment.

15. On or about December 5, 2018, the defendant ANAND KALEPU entered into a sham contract with Company-1 in which he purportedly agreed to provide medical services to Medicare beneficiaries in a telemedicine setting. In reality, KALEPU did not provide legitimate medical services to Medicare beneficiaries through Company-1. Instead, KALEPU ordered DMEPOS regardless of medical necessity, in the absence of a pre-existing doctor-patient relationship, without a physical examination and generally based solely on a short telephonic conversation with the beneficiary. In exchange for KALEPU

signing DMEPOS orders and causing the submission of DMEPOS claims regardless of medical necessity, Company-1 and others paid or caused payments to be made to KALEPU.

16. The defendant ANAND KALEPU and others concealed and disguised the fraudulent scheme by preparing or causing to be prepared false and fraudulent documentation, and/or submitting or causing the submission of false and fraudulent documentation to Medicare, including documentation stating that KALEPU had (a) determined that a particular course of treatment, including the prescription of OTS braces, was purportedly medically necessary, (b) provided Medicare beneficiaries with information regarding follow-up medical treatment and (c) counseled them to consult with their personal physicians in connection with ordering DMEPOS, when, in fact, KALEPU had not done any of the above. As a result, KALEPU and others falsified, fabricated, altered and caused the falsification, fabrication and alteration of patient files, DMEPOS orders and other records, all to support claims to Medicare for DMEPOS that were medically unnecessary, ineligible for Medicare reimbursement and/or not provided as represented.

17. For example, on or about March 21, 2019, the defendant ANAND KALEPU participated in a telemedicine-related telephone call with Patient-1, an individual whose identity is known to the United States, who had been assigned by Company-1 to KALEPU for the purpose of prescribing DMEPOS. During that call, KALEPU prescribed two OTS braces to Patient-1. Thereafter, KALEPU signed two medical records based on the telephone call, one corresponding to each OTS brace he had prescribed to Patient-1. Both medical records stated that KALEPU had provided treatment instructions to Patient-1 that he had not actually provided. Both medical records also certified that the OTS braces

prescribed to Patient-1 had been deemed medically necessary when, in fact, KALEPU had not conducted the type of examination that would permit him to make that determination.

18. In total, the defendant ANAND KALEPU submitted or caused to be submitted more than $1.3 million of false and fraudulent claims to Medicare for DMEPOS, including OTS braces, that were medically unnecessary, ineligible for Medicare reimbursement and/or not provided as represented.

19. The defendant ANAND KALEPU prescribed DMEPOS at the direction of Company-1 to residents of Brooklyn, Queens and Staten Island, New York, which are within the Eastern District of New York.

CONSPIRACY TO COMMIT HEALTH CARE FRAUD

20. The allegations set forth in paragraphs one through 19 are realleged and incorporated as if fully set forth in this paragraph.

21. In or about and between December 2018 and April 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ANAND KALEPU, together with others, did knowingly and intentionally conspire to execute, and attempt to execute, a scheme and artifice to defraud Medicare, a health care benefit program, as that term is defined under Title 18, United States Code, Section 24(b), and to obtain, by means of one or more materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items and services, contrary to Title 18, United States Code, Section 1347.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

22. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(7), which requires any person convicted of a federal health care offense to forfeit property, real or personal, that constitutes, or is derived directly or indirectly from, gross proceeds traceable to the commission of such offense.

23. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1), to seek forfeiture of any

other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 982(a)(7) and 982(b)(1); Title 21, United States Code, Section 853(p))

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

ROBERT ZINK
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

BY:
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

F.#: 2019R01376
FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

ANAND KALEPU,

Defendant.

# INFORMATION

(T. 18, U.S.C., §§ 982(a)(7), 982(b)(1), 1349 and 3551 et seq.; T. 21, U.S.C., § 853(p))

*A true bill.*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*Foreperson*

*Filed in open court this* ____________ *day,*
*of* __________ *A.D. 20* _____

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*Clerk*

*Bail, $* ____________________

***Miriam L. Glaser Dauermann, Trial Attorney, United States Dep't of Justice (718) 254-7575***