UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CASE NO. 19-CR-602-AMD

UNITED STATES OF AMERICA,
    Plaintiff,
vs.

**ANAND KALEPU,**
    Defendant.
_____/

## DEFENDANT KALEPU'S MOTION FOR DOWNWARD DEPARTURE OR VARIANCE AND SENTENCING MEMORANDUM

The Defendant, Anand Kalepu, by and through undersigned counsel, pursuant to Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. Section 3553(a) and the Due Process Clause of the Fifth Amendment to the United States Constitution, respectfully files this, his Motion for Downward Departure or Variance and Sentencing Memorandum. The Defendant moves this Court for the imposition of a reasonable sentence not greater than necessary to meet the sentencing concerns expressed by Congress in 18 U.S.C. §3553(a) of the United States Code. While the Defendant appreciates the U.S. Probation Department's recognition that a reduction from the guideline range is reasonable, he respectfully moves this Court to sentence him to a term of probation or to time served followed by supervised release.

It is an impossible task to truly convey the degree of shame and remorse that Dr. Kalepu feels for his involvement in this Medicare fraud scheme that has plagued

our public healthcare system across the country. His cultural background and the fact that he has devoted his entire life, with no hobbies, social connections or distractions, to providing for his family and supporting his four sons through their childhood and college educations, amplifies the despair that swept over Dr. Kalepu the moment federal agents knocked on his door in September 2019. There is not a person who has known Dr. Kalepu during his 70 years of life, or 38 years of medical practice, that would believe that he would be involved in such a scheme.

## THE CIRCUMSTANCES OF THE OFFENSE WARRANT A DEPARTURE

**Kalepu's involvement in telemedicine was a brief aberration.**

On December 23, 2019, Dr. Kalepu pled guilty to a one-count Information charging him with Conspiracy to Commit Healthcare Fraud in relation to his involvement providing telemedicine consultations for Medicare beneficiaries from December 2018 to April 2019. It is important to look to Dr. Kalepu's personal and professional history to gain a better understanding of how, after 38 years of working hard to provide for his family at his only true passion – medicine – Dr. Kalepu put himself in a position to be before this Court for sentencing.

Dr. Kalepu graduated from medical school in India (University of Madras) in 1975. He was then a surgical house physician for one year while awaiting his permanent resident visa from the U.S. Upon moving to the United States, he took positions as a house physician in Chicago, and then internships/general surgery

residencies in Brooklyn and the Bronx. He obtained medical licenses in Georgia, New York, New Jersey and Ohio. Throughout his career, Dr. Kalepu has maintained several simultaneous positions as a house physician and/or hospitalist in medical facilities in Ohio. He has never had his own medical practice, nor does he have experience with billing or compliance. Dr. Kalepu's positions have all been shift-work, rarely giving him the opportunity to develop a doctor-patient relationship.

Around the end of 2018, Dr. Kalepu found himself with only one active job as a hospitalist with Select Specialty Hospital in Akron, Ohio. This left him in an unfamiliar position of having free time. Dr. Kalepu then took to the internet, and on well-known job-posting sites (i.e., indeed.com), he was inundated with advertisements to work part-time from home providing telemedicine consultations.

After applying for a position with AffordADoc through indeed.com, Dr. Kalepu received brief training on their electronic medical record system and a description of the types of braces that he was expected to prescribe. From January to April 2019, Dr. Kalepu would provide his weekly availability to the AffordADoc representatives and would then receive phone calls from their call center, connecting him with patients. He would conduct a brief phone call with the patient, only verbally confirming their symptoms that appeared on the electronic record, and then authorize the (often pre-populated) DMEPOS (Durable Medical Equipment, Prosthetics, Othortics and Supplies) prescription. Dr. Kalepu never had a face-to-face interaction

3

with the patients, never developed a doctor-patient relationship and did not follow-up with the patient after the telephone consultation. His finding of medical necessity was based solely on the information provided by AffordADoc in the medical record and the short telephone conversation. That was his mistake. He was paid $30 per consultation for a total of $37,280[1]. He has returned the money he received to the Government.

As the investigations into these telemedicine companies unfold around the country, it has become clear that they often target hospitalists and house physicians such as Dr. Kalepu as tools in these fraudulent schemes, due to the nature of the work of a hospitalist (no real doctor-patient relationship, chart-review and dependence on hospital staff to guide treatment decisions/prescriptions, no experience with billing/insurance and typically no concern about compliance with Medicare regulations as most hospitals have entire departments to ensure the staff are operating within the confines of the complex Medicare regulations). While Dr. Kalepu takes complete responsibility for his actions, his work with AffordADoc comprises approximately 1% of his time as a doctor, and but for his naiveté, unsuspecting nature, lack of sophistication, minimal business acumen and the

---

[1] AffordaDoc ceased operating around April 2019, and the CEO/founder of AffodaDoc is pending sentencing (set for January 20, 20201) before U.S. District Court Judge Madeline Cox Arleo in New Jersey. (19-CR-00246-MCA)

predatory nature with which the telemedicine companies targeted doctors such as Kalepu, his reputation would continue to be based on the 99% of his 38-year career, not the handful of months during which he practiced telemedicine part-time.

**The loss amount overstates Dr. Kalepu's knowledge/involvement.**

For Dr. Kalepu's involvement with telemedicine, he was paid approximately $39,000. When doctor Kalepu was interviewed by the case agents, he explained that he believed the cost of the braces which he was prescribing were minimal (this belief was based on his research on Amazon as to the cost of various knee/wrist/back braces). He was not involved in, nor had any knowledge of, the amount billed to Medicare. He certainly had no idea that Medicare was billed $1.3 million and paid $692,021. The guidelines in healthcare fraud cases, similar to those in drug cases, rely heavily on the loss amount, not the Defendant's role in the offense. While a correct application of the guidelines warrants a fourteen-point increase due to the loss amount, and an additional two-point increase under § 2B1.1(b)(7) (Federal health care offense with intended loss amount over $1,000,000), this Court should consider a departure based on the amount Dr. Kalepu was paid and his lack of knowledge of the scope of the conspiracy. Using the amount that Dr. Kalepu was paid as a guide would result in a total offense level of 10 (placing the Defendant in Zone B with a recommended range of 6-12 months).

## ANAND KALEPU'S PERSONAL CHARACTERISTICS WARRANT A DOWNWARD DEPARTURE/VARIANCE

**Dr. Kalepu is a hard-working man that has served his family and country honorably.**

The Defendant grew up in India, spending his adolescence in boarding school, and then obtaining his education, through medical school, with the support of his parents and six sisters. Since coming to the United States in 1976, he has worked hard, maintaining several jobs as once, and after becoming a naturalized citizen in 1987, he immediately volunteered and served in the United States Army Reserves from 1988 to 1996. Dr. Kalepu achieved the rank of major (field surgeon) and was on active duty for Operation Desert Shield/Storm from October 1990 to April 1991. Ultimately, he received the National Defense Service Ribbon and was honorably discharged. Recently, the Defendant has attempted to work at the military base near his home, but was not given any shifts due to the instant case.

Dr. Kalepu lives a modest life, and as described by his wife of twenty-seven years, Dr. Sudheera Kalepu, he has no interest in luxuries, rather is driven by a sense of purpose and dedication to his patients. He doesn't drive an expensive car, buys his clothing at discount stores, does not socialize nor travel. Instead, he sees his purpose as caring for his patients, and the fruits of his labor are dedicated to ensuring his children are cared for and all receive good educations from well-respected schools. In the attached joint letter from three of Dr. Kalepu's sons, they describe a

father that was at work twice as much as he was home, often working six twelve-hour shifts in a row. However, on his days off, instead of resting, he would be sure to take his sons to a Cleveland Indians or Cavaliers game, or to one of the local museums.

Kalepu's sons exhibit impressive maturity, describing how they have come to understand, appreciate and respect their father for his dedication and hard work. They recognize that his work allowed them to focus on their studies and left them wanting for nothing. Sandeep Kalepu is twenty-four years-old and graduated from the University of Michigan. Vineeth Kalepu is twenty-one years old and a student at Clevelan State University, and Ajeet Kalepu is eighteen years-old and a student at Case Western University. Anand's oldest son, Akhil Kalepu, is thirty years-old and attended George Washington University and Temple University. They understand the example that he set for them: that dedication was the path to success, and they appreciate the love he had for this country, as it was one where a person could distinguish himself by exhibiting his good character and hard work (unlike his home country where your worth was determined by caste and miscellaneous labels).

**Given Dr. Kalepu's age, category I underscores his lack of criminal history.**

Anand Kalepu has zero criminal history points and falls within the lowest realm of federal Sentencing Guideline criminal history Category I. Offenders with little or no previous criminal history record pose the lowest likelihood of recidivism. This has been determined to warrant significantly below-guidelines variance sentences. By example, see ***U. S. v. Autery***, 555 F.3d 864 (9th Cir. 2009); ***U. S. v. Huckins***, 529 F.3d 1312 (10th Cir. 2008), ***U.S. v. Tomko***, 562 F.3d 558 (3d Cir. 2009)(en banc). This is especially true given Dr. Kalepu's age, and this Court should consider a departure to recognize the difference in a Defendant who, at 70, qualifies for Category I, compared to a twenty-year-old who qualifies for Category I.

**Dr. Kalepu's actions since September 2019 go beyond mere "acceptance."**

Dr. Kalepu first learned that his involvement in this scheme had caused him to be placed under investigation when federal agents visited his home. He retained counsel and authorized them to schedule a proffer session with the government. In the days in between these two events, he for the first time read the rules pertaining to the use of telemedicine and he swiftly realized the unlawfulness of his conduct: he had not established a true patient/doctor relationship and he had not properly determined the medical necessity upon which the prescriptions he signed had to be

based. Dr. Kalepu was - and remains - devastated and distraught that his failure to learn and follow the laws and rules pertaining to telemedicine facilitated significant fraud. He truthfully disclosed the details of his knowledge of the faceless co-conspirators with whom he had communicated by email, and offered an organized compendium of his email record of communications to and from the people who organized and managed the conspiracy. Dr. Kalepu agreed to proceed by information to which he self-surrendered and pled guilty the same day. Prior to entering into a plea agreement, Dr. Kalepu, through the meticulous notes he kept of each patient interaction and his financial records, was able to determine the exact amount of money he received for his work with AffordaDoc and immediately deposited those funds into counsel's trust account. As of the filing of this motion, the forfeiture amount of $38,790 has been paid in full.

**Dr. Kalepu's age and underlying medical conditions warrant a departure.**

Dr. Kalepu suffers from a litany of medical conditions, all listed in the presentence report. He is prescribed 14 different medications and has limited use of his left leg. These conditions and his age were relevant factors for this Court to consider prior to the COVID-19 pandemic. Given the serious nature with which New York state and the courts have treated the pandemic, there seems no need to belabor

the point – Dr. Kalepu is considered high-risk for severe illness from COVID-19, with 8 out of 10 deaths occurring in those over the age of 65 (Kalepu's underlying conditions exacerbate his risk). Given his age, medical conditions and COVID-19 risks, a sentence of incarceration, even brief, could result in severe illness or death.

## CONCLUSION

It is beyond doubt that Anand Kalepu will never again engage in criminal conduct. He is 70 years of age and this is the first significant blemish on his lifelong record valuable, professional, and caring service to the communities in which he has lived and worked. Yes, he did a dumb thing, made a bad mistake, and exercised poor judgment. He is not a bad person.

Anand was raised, and has lived his life, based on two principles: work hard and act only in a manner that will bring pride unto yourself and your family's name. But for his actions during the first half of 2019, he has done everything in his power to live his life, and raise his children, according to those principles. What impacts Dr. Kalepu more than any sentence this Court could give him is the fact that he has violated these principles and will lose the ability to continue work hard as a doctor. The shame and stress of this case, and his actions, have had a profound effect on Dr. Kalepu, and the loss of his reputation and career will serve as a deterrent to Dr. Kalepu, and others.

WHEREFORE, Anand Kalepu respectfully requests that this Honorable Court consider all of the above, as well as further argument *ore tenus*, when making its §3553(a) analysis, and sentence the Defendant to a below guidelines sentence of probation or supervised release, as that is what is adequate and just.

Respectfully submitted,

**WILLIAM TUNKEY, P.A.**
2250 Southwest Third Avenue, #400
Miami, Florida 33129
Telephone: (305) 858-9550

By: /s/ William R. Tunkey
    WILLIAM R. TUNKEY
    PRO HAC VICE COUNSEL
    FLORIDA BAR NO. 125153

**ROSS AMSEL RABEN NASCIMENTO, PLLC**
2250 S.W. 3rd Avenue, 4th Floor
Miami, Florida 33129
Telephone: 305-858-9550
Fax: 305-858-7491

By: /s/Joseph Nascimento
    JOSEPH NASCIMENTO
    PRO HAC VICE COUNSEL
    FLORIDA BAR NO. 070096